Dear Ms. Landrieu:
You requested the opinion of this office concerning several questions that have arisen regarding the Mineral Revenue Audit and Settlement Fund (the "Mineral Settlement Fund") as it pertains to the classification of royalties received by the State through settlements or judgments resulting from underpayment of severance taxes, royalty payments, bonus payments, or rentals (the "Settlement Monies").
Article VII, Section 10.5 of the Louisiana Constitution ("Section 10.5") creates and establishes the Mineral Settlement Fund, which applies to "revenues received in each fiscal year by the state through settlements or judgments which equal, in both principal and interest, five million dollars or more for each such settlement or judgment, resulting from underpayment to the state of severance taxes, royalty payments, bonus payments, or rentals".
Section 10.5 then mandates the Treasurer to allocate the Settlement Monies in the following manner and order of priority as required:
 "(1) To the Bond Security and Redemption Fund as provided in Article VII, Section 9 (B) of this constitution."
Article VII, Section 9 (B) ("Section 9 (B)") requires that all state money (with one limited exception) deposited in the state treasury be credited to a special fund designated as the Bond Security and Redemption Fund ("BSRF"). In each year, an amount is allocated from BSRF sufficient to pay full faith and credit obligations of the state. Thereafter, money in BSRF is credited as provided by law, and if no law provides for the disposition of the money, it is credited to the state general fund.
 The second allocation set forth in Section 10.5 is as follows:
 "(2) To the political subdivisions of the state as provided in Article VII, Section 4 (D) and (E) of this constitution."
Article VII, Section 4 (D) ("Section 4 (D)") pertains to the amount of severance taxes from sulphur, lignite, timber and other natural resources which is to be remitted to the governing authority of the parish in which severance or production occurs. Article VII, Section 4 (E) ("Section 4 (E)") provides that one-tenth of the royalties from mineral leases on state-owned land, lake and river beds and other water bottoms are to be remitted to the governing authority of the parish in which severance or production occurs.
The third allocation of revenues provided in Section 10.5 is as follows:
 "(3) As provided by the requirements of Article VII, Sections 10-A, 10.1, 10.2, and 10.3 of this constitution."
Article VII, Section 10-A ("Section 10-A") establishes the Conservation Fund within the state treasury. Section 10-A(1) requires that all revenue from the types and classes of fees, licenses, permits, royalties, or other revenue paid into the Conservation Fund as provided by law on the effective date of Section 10-A, July 1, 1988, is to be paid into the Conservation Fund. Therefore, in order for the Treasurer to determine if indeed any of the Settlement Monies are to be paid into the Conservation Fund, it must be determined whether the Settlement Monies are revenues which would have been paid into the Conservation Fund on July 1, 1988.
Since 1936, our law has provided that all revenue derived from mineral leases or exploitation in any way of the mineral resources of any lands under the jurisdiction of the Wildlife and Fisheries Commission is dedicated to the Commission. La. R.S.56:631. All monies collected by the Commission are to be deposited into the Conservation Fund, La. R.S. 56:10; therefore, revenues from mineral leases under the jurisdiction of the Commission are included in the Conservation Fund.
Article VII, Section 10.1 ("Section 10.1") establishes the Louisiana Education Quality Trust Fund (the "8g Fund") in the state treasury and requires deposit into the 8g Fund of all monies (except the first $100 million) received "from the federal government under Section 1337 (g) of Title 43 of the United States Code which is attributable to mineral production activity or leasing activity on the Outer Continental Shelf which has been held in escrow pending a settlement between the United States and the state of Louisiana".
Article VII, Section 10.2 ("Section 10.2") establishes the Wetlands Conservation and Restoration Fund (the "Wetlands Fund") within the state treasury. This fund pertains to "revenues received in each fiscal year by the state as a result of the production of or exploration for minerals, hereinafter referred to as mineral revenues from severance taxes, royalty payments, bonus payments, or rentals, and excluding such revenues received by the state as a result of grants or donations when the terms and conditions thereof require otherwise" (hereinafter the term "mineral revenues" shall refer to the definition found in Section 10.2). The Treasurer is to allocate the mineral revenues to (1) BSRF as provided in Section 9 (B); (2) political subdivisions as provided in Sections 4 (D) and (E); and (3) as provided by the requirements of Sections 10-A and 10.1. Thereafter, the Treasurer is required to deposit a portion of the State's mineral revenues in the Wetlands Fund in accordance with a formula, discussed in greater detail hereinafter.
Article VII, Section 10.3 ("Section 10.3") establishes the Revenue Stabilization/Mineral Trust Fund (the "Revenue Stabilization Fund") into which is to be deposited all revenues received in each fiscal year by the state in excess of $750 million as a result of the production of, or exploration for, minerals, including severance taxes, royalty payments, bonus payments, or rentals, and excluding such revenues received by the state as a result of grants or donations when the terms or conditions thereof require otherwise and revenues derived from any tax on the transportation of minerals. It should, however, be noted that Section 10.5 (B) would exclude the Settlement Monies for purposes of determining whether the base amount of $750 million has been reached for purposes of determining if monies should be deposited to the Revenue Stabilization Fund.
 Section 10.5 (B) then provides in pertinent part as follows:
 "(B) After making the allocations provided for in Paragraph (A), the treasurer shall then deposit in and credit to the Mineral Revenue Audit and Settlement Fund any such remaining revenues. Any revenues deposited in and credited to the fund shall be considered mineral revenues from severance taxes, royalty payments, bonus payments, or rentals for purposes of determining deposits and credits to be made in and to the Wetlands Conservation and Restoration Fund as provided in Article VII, Section 10.2 of this constitution. Any revenues deposited in and credited to the fund shall not be considered mineral revenues for purposes of the Revenue Stabilization Mineral Trust Fund as provided in Article VII, Section 10.3 of this constitution . . ."
Your first question is whether the Constitution or statutes require the Treasurer to deposit in, and classify to, the Wetlands Fund settlements or judgments resulting from underpayment of severance taxes or royalty payments, bonus payments and rentals?
As quoted above, the Constitution in Section 10.5 (A) specifically requires the Treasurer to deposit in, and classify to, the Wetlands Fund settlements or judgments resulting from underpayment of severance taxes or royalty payments, bonus payments, and rentals, provided that the settlement or judgment equals, in both principal and interest, $5 million or more, and provided that the monies received therefrom are allocated in the priority stated above, in accordance with the requirements of Section 9 (B), Section 4 (D) and (E), Section 10-A, Section 10.1, and then Section 10.2. If any settlement or judgment monies thereafter remain unexpended, such monies would next be allocated to the Revenue Stabilization Fund in accordance with the provisions of Section 10.3. If any settlement or judgment monies thereafter remain unallocated, such would be deposited into the Mineral Settlement Fund in accordance with the provisions of Section 10.5.
Of course, each individual settlement will have to be analyzed to determine the nature of the Settlement Monies. Settlement Monies may be allocated to some, but not all, of the constitutional funds mentioned in Section 10.5. For example, the recent Texaco settlement monies were allocated as follows:
 (a) To BSRF in accordance with Section 9 (B);
 (b) To the parishes in accordance with Section 4 (E);
 (c) To the Conservation Fund in accordance with Section 10-A.
 (d) Because the Texaco settlement monies were not received from the federal government under Section 1337 (g) of Title 43 of the United States Code which is attributable to mineral production activity or leasing activity on the Outer Continental Shelf which has been held in escrow pending a settlement between the United States and the state of Louisiana, the Texaco settlement monies should not have been, and were not, deposited into the 8g fund (Section 10.1).
 (e) The Wetlands Fund did, it is my understanding, receive a portion of the Texaco settlement monies pursuant to Section 10.2. The Wetlands Fund will be discussed in greater detail hereinbelow in connection with your second question.
 (f) Texaco settlement monies were not credited to the Revenue Stabilization Fund because the requirement of Section 10.3, that mineral revenues received by the State exceed $750 million, was not met.
 (g) It is my understanding that the balance of the Texaco settlement monies were deposited into the Mineral Settlement Fund pursuant to the provisions of Section 10.5.
As shown by the disposition of the Texaco settlement monies, some of the constitutional funds mentioned in Section 10.5 will be credited with Settlement Monies, while others will not, depending upon the sources of the Settlement Monies.
Your second question pertains to the disposition of the Settlement Monies depending upon the amount of mineral revenues which have been received by the state. Five different factual situations are presented. Specifically, you ask: when the state receives a settlement(s) or judgment(s) resulting from the underpayment of severance taxes, royalty payments, bonus payments, or rentals, what is the disposition of these monies if, at the time of receipt, the mineral revenues as determined by Section 10.2, are less than $600 million including the judgment or settlement?
As set forth above, Section 10.2 requires the Treasurer to allocate mineral revenues to (1) the BSRF as provided in Section 9 (B); (2) political subdivisions as provided in Sections 4 (D) and (E); and (3) as provided by the requirements of Sections 10-A (the Conservation Fund) and 10.1 (the 8g Fund). Thereafter, the Treasurer is required to deposit mineral revenues as follows:
 "(B)(1) After making the allocations provided for in Paragraph (A), the treasurer shall then deposit in and credit to the Wetlands Conservation and Restoration Fund any amount of mineral revenues that may be necessary to insure that a total of five million dollars is deposited into such fund for the fiscal year from this source; provided that the balance of the fund which consists of mineral revenue from severance taxes, royalty payments, bonus payments, or rentals shall not exceed forty million dollars.
 (2) After making the allocations and deposits provided for in Paragraphs (A) and (B)(1) of this Section, the treasurer shall deposit in and credit to the Wetlands Conservation and Restoration Fund as follows:
 (a) Ten million dollars of the mineral revenues in excess of six hundred million dollars which remain after the allocations provided for in Paragraph (A) are made by the treasurer.
 (b) Ten million dollars of the mineral revenues in excess of six hundred fifty million dollars which remain after the allocations provided in Paragraph (A) are made by the treasurer.
 However, the balance of the funds which consists of mineral revenues from severance taxes, royalty payments, bonus payments, or rentals shall not exceed forty million dollars."
The Treasurer is required by Section 10.2 (B) (1) to credit $5 million of mineral revenues to the Wetlands Fund every fiscal year, provided that the balance in the fund from mineral revenues does not exceed $40 million. The Treasurer is not authorized to credit the Wetlands Fund with the additional $10 million payments required by Sections 10.2 (B)(2)(a) and (b), unless and until mineral revenues are actually received by the State in excess of $600 and $650 million, respectively. Then and only then is the Treasurer authorized to credit the additional $10 million amount(s) to the Wetlands Fund. The Treasurer must, therefore, make a factual determination, as of the date that the Settlement Monies are received by the State, as to the amount of mineral revenues that have actually been received by the State. Of course, this determination is only required if there are available unallocated Settlement Monies after those monies are credited and/or allocated to BSRF, the political subdivisions, the Conservation Fund, and the 8g Fund.
Thus, if on the date of receipt of the Settlement Monies, the mineral revenues received by the State are less than $600 million including the Settlement Monies, the Wetlands Fund would receive the $5 million required to be paid pursuant to Section 10.2 (B)(1), unless the Wetlands Fund balance from mineral revenues exceeds $40 million. If the $5 million required by Section 10.2 (B)(1) has already been paid into the Wetlands Fund, none of the Settlement Monies would be allocated to the Wetlands Fund because the mineral revenues received by the State are less than $600 million. Because the threshold $750 million amount required by the Revenue Stabilization Fund has not been met, none of the Settlement Monies would be deposited to the Revenue Stabilization Fund and the Settlement Monies would be credited to the Mineral Settlement Fund pursuant to Section 10.5.
The second factual situation presented is if on the date of receipt of the Settlement Monies, the mineral revenues received by the State are greater than $600 million and less than $650 million excluding the judgment or settlement. Section 10.5 (B) requires revenues deposited in and credited to the Mineral Settlement Fund to be considered mineral revenues from severance taxes, royalty payments, bonus payments, or rentals for purposes of determining deposits and credits to be made in and to the Wetlands Fund. Therefore, it is necessary to include the Settlement Monies in determining the amount of mineral revenues received by the State. If the Settlement received by the State is less than $750 million, no moneys would be deposited to the Revenue Stabilization Fund, because the $750 million base amount required by Section 10.3 has not been reached. The balance of the Settlement Monies would then be deposited into the Mineral Settlement Fund.
If mineral revenues received by the State are greater than $600 million, but less than $650 million, including the Settlement Monies, and if the $5 million payment required by Section 10.2 (B)(1) has not been made, such payment must be made if the balance from mineral revenues in the Wetlands Fund is below $40 million. If the $5 million payment to the Wetlands Fund was made, and assuming that the balance in the Wetlands Fund is less than the $40 million cap and assuming that the $10 million credit required by Section 10.2 (B)(2)(a) has not been made from other mineral revenues, an additional $10 million must be deposited to the Wetlands Fund from the Settlement Monies.
The next situation posed is if the Settlement Monies are greater than $600 million and less than $650 million by including the judgment or settlement? As stated above, the Settlement Monies are required to be included in the determination of mineral revenues for purposes of determining the credits and deposits to the Wetlands Fund.
The next two situations presented are the disposition of the Settlement Monies if mineral revenues received by the State are greater than $650 million excluding or including the judgment or settlement? Assuming that the $5 million deposit required by Section 10.2 (B)(1) and the $10 million deposit required by Section 10.2 (B)(2)(a) have both been made and the Wetlands Fund balance does not exceed $40 million, and assuming that the $10 million deposit required by Section 10.2 (B)(2)(b) has not been made from other mineral revenues, a $10 million deposit must be made to the Wetlands Fund from the Settlement Monies. As stated above, Section 10.5 (B) would require the Settlement Monies to be included in the determination of mineral revenues received by the State for purposes of determining deposits and credits to the Wetlands Fund. Assuming that there are unallocated Settlement Monies after the second $10 million has been deposited to the Wetlands Fund, the balance of the Settlement Monies would go to the Mineral Settlement Fund.
It must be restated that the answer to these five hypothetical situations are based upon the Settlement Monies meeting the criteria of Section 10.5 and provided that there are unallocated Settlement Monies after the appropriate credits and deposits have been made to BSRF, the political subdivisions, the Conservation Fund and the 8g Fund, all as is required by Section 10.5 (A)(1) through (3).
Your third question is what is the disposition of these settlement(s) or judgment(s) if the above conditions outlined in question number 2 above are not met until the final close of the fiscal year (forty-five days after June 30 of each year)?
As stated earlier, the determination of whether part of the Settlement Monies go into the Wetlands Fund must be determined as of the date that the Settlement Monies are received by the State. If, for example, the Revenue Estimating Conference estimates that mineral revenues of the State will exceed $600 million for the fiscal year; yet on a certain date the amount of mineral revenues received by the State, including the Settlement Monies received that date, do not equal $600 million, the Wetlands Fund would not be entitled to a portion of the Settlement Monies. If at the end of the fiscal year, it is determined that mineral revenues have exceeded $600 million for the fiscal year, $10 million must be deposited into the Wetlands Fund from mineral revenues, but not from Settlement Monies. If, however, Settlement Monies are received and it is determined that the amount of mineral revenues exceeds $600 million, Settlement Monies should be deposited into the Wetlands Fund.
Your last question is whether settlements or judgments resulting from the underpayment of severance taxes, royalty payments, bonus payments, or rentals generated on lands designated as Rockefeller Wildlife and Game Preserve (donated by the Rockefeller Foundation), Marsh Island (donated by the Russell Sage Foundation), and the lands administered by the Department of Wildlife and Fisheries are required to be deposited in and classified to the "Wetlands Fund"?
With respect to mineral revenues generated from the Rockefeller lands ("Rockefeller Revenues"), in 1920 the Rockefeller Foundation donated over 85,000 acres to the State subject to the condition that the property be held and used as a wild life refuge or game preserve, owned and maintained as such by the State. Mineral development is allowed by the act of donation (the "Rockefeller Act of Donation") but only if such mineral development will not cause disturbance to the wildlife, nor pollution to the refuge and "upon the further condition that the revenues from such oils or minerals so mined and developed shall be first used for the purpose of paying the expense of the maintenance, policing and improvement of this wild life refuge or reserve, and the development of conditions suitable for improving such wild life refuge or reserve. Any surplus of revenues coming from such mining developments shall be used by the State of Louisiana for the development and improvement of the public schools of the State of Louisiana or for public health work within the State of Louisiana." Failure to comply with the terms of the donation may cause the property to revert to the donor.
In 1944, the Rockefeller Foundation donated its interest in the property and the Act of Donation, including the reversionary clause, to the United States Department of the Interior. The conditions and restrictions of the donation have been modified twice, in 1983 and in 1988, by Memorandum of Agreement between the Department of Interior and the State. The clause concerning mineral development at the Rockefeller Refuge was amended in both Memoranda and now provides in pertinent part: "Oils and minerals may be mined and developed on the lands donated . . . and upon the further condition that the revenues from such oils or minerals so mined and developed and all income earned from investments of such revenues shall be first used for the purpose of paying the expense of the maintenance, policing and improvement of this wildlife refuge or preserve, and the development of conditions suitable for improving such wildlife refuge or preserve. Any surplus of revenues coming from such mining developments shall be used by the Louisiana Department of Wildlife and Fisheries in wildlife management programs and activities, particularly land acquisition throughout the State . . ."
Section 10.2 only applies to "revenues received in each fiscal year by the state as a result of the production of or exploration for minerals, hereinafter referred to as mineral revenues from severance taxes, royalty payments, bonus payments, or rentals, and excluding such revenues received by the state as a result of grants or donations when the terms and conditions thereof require otherwise" (Emphasis supplied). It is the opinion of this office that the terms and conditions of the Rockefeller Act of Donation, as amended by the two Memoranda of Understanding, would prohibit the Rockefeller Revenues from being used for any purpose except as specifically set forth in the Rockefeller Act of Donation, as amended. Furthermore, the purposes for which monies in the Wetlands Fund may be used are not consistent with the allowable uses of the Rockefeller Revenues. Therefore, the revenues derived from the Rockefeller Refuge can not be deposited into the Wetlands Fund.
It is the further opinion of this office that should there be a settlement or judgment resulting from the underpayment of severance taxes, royalty payments, bonus payments or rentals from the Rockefeller Refuge, that such monies would have to be used in accordance with the Rockefeller Act of Donation, as amended, and not in accordance with Section 10.5. The Rockefeller Act of Donation is a contract between the State and the Rockefeller Foundation, as assigned to the Department of Interior. La. R.S.56:797. Article I, Section 23 of the Louisiana Constitution and Article I, Section 10 [1] of the United States Constitution, prohibit the enactment of a law which impairs the obligation of contracts.
With regards to settlements and judgments resulting from the underpayment of severance taxes, royalty payments, bonus payments, or rentals generated on lands designated as Marsh Island, in 1920 the Russell Sage Foundation donated by Deed of Donation in excess of 75,000 acres of land to the State of Louisiana. The donation was condition upon the property being used as a wild life refuge or game preserve, owned and maintained as such by the State. In the event that the donee fails to comply with the terms of the Deed of Donation, the property "and all of the mineral rights thereon" may revert to the donor.
Mineral development on Marsh Island is limited to leases which may be mutually agreed upon between the Russell Sage Foundation and the State Mineral Board, and under such conditions, rules and regulation as will, to the satisfaction of the Russell Sage Foundation, afford adequate present and future protection of Marsh Island for the purpose for which it was donated by the Russell Sage Foundation to the State, and on the condition that the State pay the Russell Sage Foundation one-half of the revenues due the State from the leases and that the other half be dedicated to maintaining, policing, and improving Marsh Island as a wildlife refuge or reserve and any excess thereafter be set aside for future maintenance, policing and improving of Marsh Island as wildlife refuge and the other part available to the Department of Wildlife and Fisheries for statewide projects for the propagation and protection of wildlife in the state. La. R.S. 56:798. See also "Memorandum of Understanding as to the Basis For Handling State's One-Half Share of Mineral Revenues from Marsh Island" between the State, through the State Land Office, and the Russell Sage Foundation.
For the same reasons as set forth above in connection with the Rockefeller Revenues, it is the opinion of this office that the Marsh Island Revenues cannot be placed in the Wetlands Fund (Section 10.2) nor in the Mineral Settlement Fund (Section 10.5).
Whether mineral revenues derived from other properties which are administered by the Department of Wildlife and Fisheries, should be deposited into the Wetlands Fund (or the Mineral Settlement Fund) will depend upon whether the monies are dedicated to the Conservation Fund in accordance with the provisions of Section 10-A. See discussion above.
Trusting this adequately responds to your request, I remain
Yours very truly,
 Richard P. Ieyoub Attorney General